NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230553-U

NO. 4-23-0553

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 26, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| KAMYJAH A. BIAS, | ) | No. 22CF332 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Dwayne Gab, |
| | ) | Ryan M. Cadagin, |
| | ) | Judges Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Harris and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The juvenile court abused its discretion by transferring defendant to the criminal court without sufficient evidence on all of the statutory and nonstatutory factors it was required to consider. Therefore, this court must vacate the juvenile court's transfer order, reverse the circuit court's judgment in this case, and remand this matter to the juvenile court for further proceedings.

¶ 2    On November 18, 2021, the State brought a petition against defendant, Kamyjah A. Bias, alleging she was a delinquent minor under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)). The petition charged her with first degree murder (720 ILCS 5/9-1 (West 2020)), unlawful use of a weapon (*id.* § 24-1(a)(2)), aggravated battery causing great bodily harm (*id.* § 12-3.05(a)(1)), aggravated battery with a deadly weapon (*id.* § 12-3.05(f)(1)), aggravated battery in a public place (*id.* § 12-3.05(c)), and unlawful use of a weapon (*id.* § 24-1(a)(2)). The State later added an attempt (first degree murder) charge (*id.* § 8-4(a), 9-1(a)(1).

¶ 3        On November 30, 2021, the State petitioned the juvenile court to transfer defendant

from juvenile court to criminal court to allow for her prosecution under Illinois criminal law. On

April 12, 2022, Judge Dwayne Gab granted the State's petition. The next day, a grand jury indicted

defendant on three counts of first degree murder (*id.* § 9-1(a)(1), (a)(2)), one count of unlawful use

of a weapon (*id.* § 24-1(a)(2)), three counts of aggravated battery (*id.* § 12-3.05(a)(1), (c), (f)(1)),

one count of unlawful use of a weapon (*id.* § 24-1(a)(2)), and one count of attempt (first degree

murder) (*id.* § 8-4, 9-1(a)(1)). After a bench trial before Judge Ryan Cadagin in February 2023,

the trial court found defendant guilty on all counts. On April 19, 2023, the court sentenced

defendant to consecutive sentences in the aggregate of 43 years in prison.

¶ 4        On appeal, defendant makes the following arguments: (1) the juvenile court

improperly transferred her to criminal court because the State presented insufficient evidence on

factors the court was required to consider; (2) (a) her first degree murder and attempt (first degree

murder) convictions should be reversed because the State failed to negate any element of

self-defense beyond a reasonable doubt; (b) in the alternative, this court should reduce her first

degree murder conviction to either (i) second degree murder because she established by a

preponderance of the evidence that this was mistaken belief self-defense or (ii) involuntary

manslaughter because she acted recklessly; (3) (a) the criminal court erred when it barred Dr. Joel

Eckert's testimony because Eckert could have provided support to defendant's mistaken belief

self-defense claim; (b) defendant's attorney was ineffective for failing to renew defendant's

motion *in limine* seeking to admit Eckert's testimony after defendant waived her right to a jury

trial; and (4) the criminal court imposed an excessive sentence where it failed to adequately

consider defendant's youth and attendant circumstances.

¶ 5        Based on our review of the record, we hold the juvenile court abused its discretion

in transferring defendant to criminal court for prosecution under Illinois criminal law. The juvenile court did not have sufficient evidence and/or information regarding several statutory and nonstatutory factors it was required to consider before transferring defendant. As a result, we must reverse the judgment of the Sangamon County circuit court, vacate the juvenile court's transfer order, and remand this case for further proceedings in the juvenile court.

¶ 6                                    I. BACKGROUND

¶ 7                                    A. Juvenile Court

¶ 8        On November 18, 2021, the State filed a petition alleging defendant was a delinquent minor under the Act, charging her as previously stated. On November 30, 2021, defendant entered a not guilty plea. That same day, the State filed a juvenile transfer petition. On December 21, 2021, the juvenile court entered an order for a mental health evaluation of defendant.

¶ 9        On April 11, 2022, the juvenile court held a hearing on the State's transfer petition. Dr. Eckert, a clinical psychologist who had performed defendant's mental health evaluation, testified he reviewed police reports from the charged incident, police reports from another incident at Washington Middle School in Springfield, Illinois, which did not involve defendant, and defendant's school records, which included an individualized education plan (IEP), before meeting with defendant. Defendant's school records showed (1) she had accumulated 66.71 absences as of December 2021; (2) she had significant deficits in reading comprehension, oral fluency, and general writing skills as of May 2019; (3) she had refused—at some point—to attend or participate in class, complete assignments, and attend speech and language therapy; and (4) her IQ was scored at 79 when she was seven years old. Eckert indicated the records showed school personnel later wanted to reevaluate defendant, but defendant's mother would not consent.

¶ 10       Eckert testified he interviewed defendant for approximately 90 minutes at a juvenile

detention center on December 31, 2021. When asked why she was incarcerated, defendant indicated Eckert should talk to her lawyer. However, defendant described her arrest in considerable detail. When asked about her schooling before she was arrested, defendant said she attended the Douglas Alternative School (Douglas) in the morning and Lanphier High School (Lanphier) in the afternoon. While receiving nothing lower than a "B" at Douglas, she was failing her classes at Lanphier. Defendant indicated she only had one real friend at school, hung out with cousins outside of school, and had no history of fights at either Lanphier or Douglas. Defendant told Eckert she lived with her mother, two sisters, and two brothers, denying significant problems with her family.

¶ 11　　　　In addition, Eckert told the juvenile court he spoke with Kaneisha Mahr, defendant's mother, on the phone for 45 minutes and confirmed the familial information defendant had provided. Mahr said she was a single mother and worked full-time and resisted providing information about defendant's home life. However, she described defendant as quiet and isolated with occasional outbursts. Other than an occasional conversation about basketball, Mahr indicated she and defendant did not talk much. Mahr gave Eckert the impression she did not know about any conflicts defendant might have had with other people. Mahr indicated defendant had a difficult time after her grandmother died three or four years earlier.

¶ 12　　　　Turning back to his interview with defendant, Eckert testified defendant said she had never received mental health services and did not have any family history of mental illness. However, Mahr said defendant had seen a therapist through the Urban League when she was five or six years old due to her behavior, but she may have been too young to participate in therapy at that time. While defendant had been medicated at some point, the medicine was discontinued because it made her ill. In addition, Mahr said defendant had been taken to the hospital for a possible overdose in September 2021.

¶ 13      While defendant was oriented to time, place, person, and situation and her presentation matched her chronological age, Eckert testified it appeared defendant had been late in reaching most of her developmental milestones, which he believed was critical to her understanding of her situation. The psychologist indicated defendant made adequate eye contact and had adequate memory and concentration. However, her general cognitive ability and verbal comprehension were both extremely low. Further, her nonverbal reasoning was in the low-average range. Eckert determined defendant's verbal IQ was 67, her nonverbal IQ was 82, she read at a fourth-grade level, and she scored lower than a typical seven-year-old child on a picture vocabulary test.

¶ 14      Eckert testified he subjected defendant to three personality assessment inventories, which indicated defendant had significant thinking and concentration problems and most likely would be withdrawn and isolated. The results of the assessment inventories consistently hypothesized defendant would experience significant difficulties creating and maintaining any type of reasonable social support network. Eckert found no evidence defendant had a formal thought disorder or psychosis, but defendant did indicate difficulties consistent with a significant depressive experience, with a moderate feeling of sadness, and borderline normal stress and anxiety. The inventory results indicated defendant was likely to be impatient and easily irritated but posed no risk of harming herself.

¶ 15      In addition, Eckert noted the results of the personality assessment inventories suggested defendant would be motivated to engage in treatment and would need treatment. However, Eckert testified treatment could be challenging for defendant because she tended to be distrustful and would have difficulty establishing a trusting and viable working relationship with an adult, particularly someone she would see as an authority figure. When Eckert asked defendant

to assess herself, she was generally negative, harshly critical, and had self-doubt. Eckert described defendant's current clinical profile as characteristic of an adolescent who struggles with numerous inner conflicts evident through unpredictable behavior and impulsive tendencies that could contribute to poor decision-making and acting out. One of the inventory assessments indicated defendant had a significant underlying disposition to break social rules and to have significant generalized delinquent tendencies. According to Eckert, defendant also seemed to lack insight and empathy in conjunction with significant social and inner personal immaturity and saw the world in a "very immature, self-centered manner."

¶ 16       Eckert diagnosed defendant as mildly intellectually disabled, with an adjustment disorder mixed with anxiety, depressed mood, moderate oppositional defiant disorder, persistent depressive disorder, borderline features, and academic and educational problems. According to Eckert, defendant needed an experienced and skillful therapist who could work with her on a long-term basis because her suspicion of adult authority figures was far greater than the average teen. Eckert asserted defendant would need several years of therapy continuing into her adult years.

¶ 17       On cross-examination, Eckert testified defendant later provided him with her version of events regarding the charged offense. Defendant said she encountered some older and larger males and was afraid she would be attacked. Eckert believed defendant could benefit from "relatively long-term individual therapy" and "group therapy would be both appropriate and necessary" when she was ready. Eckert also believed defendant had the potential to make progress with treatment. According to Eckert, "her history as I understand it does not reveal any significant behavioral problems in spite of the fact that she's been dealing with a lot of environmental difficulties." This opinion was based in part on defendant's lack of a prior criminal history and her pleasant demeanor during her 90-minute interview with Eckert. While Eckert said many of his

interactions with delinquent minors are difficult, his interaction with defendant was easy and she was very cooperative. When defense counsel asked Eckert whether defendant could have assessed the appropriate way to deal with the confrontation she faced at Lanphier, Eckert stated defendant would experience difficulty in that type of situation because of her limited cognitive abilities and her poorly developed social and interpersonal skills. Eckert thought defendant would find it difficult to get help from a trusted adult in that type of situation. Further, Eckert testified he would not expect defendant to be able to find an adult she would ask for help.

¶ 18    As for the effect adult prison would have on defendant, Eckert said being housed with adult inmates in an adult prison would be very difficult for defendant because she could easily be taken advantage of and manipulated. Eckert suspected defendant would be a hardened individual, emotionally and otherwise, after serving an adult prison sentence. He also told the juvenile court it was not his impression defendant was the type of individual who sought conflict or looked for trouble and was far less mature than her average peer of the same age.

¶ 19    The State's next witness was Natasha Melcher, who worked for Sangamon County court services, was defendant's assigned court services officer, and conducted a social history investigation on defendant. Her report was admitted as evidence. Melcher interviewed defendant during her investigation, but defendant's mother refused to be interviewed. Melcher also indicated she obtained defendant's school records and Eckert's psychological assessment, "called and checked in" with the juvenile detention center in Peoria, Illinois, reviewed defendant's Sangamon County history, reviewed the circumstances surrounding defendant's arrest and detention, and administered a detention screener, which indicated defendant was a moderate to high risk to reoffend. Melcher indicated defendant received an informal station adjustment after two prior referrals for aggravated battery on February 4, 2019, and for battery on February 28, 2019, with

Sangamon County court services but provided the court with no factual information regarding either of the incidents leading to the referrals. Defendant was supervised by court services for an informal period of time.

¶ 20    According to Melcher, when defendant entered juvenile detention on November 19, 2021, she tested positive for both cannabis and methamphetamine. Defendant admitted using cannabis on the day of her arrest. Defendant's school records showed she had a 39% attendance rate, an IEP, no disciplinary referrals in high school, and 52 office referrals in middle school for disrespect. Eleven percent of defendant's referrals were for aggression and bullying. Melcher failed to provide any details about any of defendant's referrals. Melcher testified defendant had been splitting her school day between Douglas and Lanphier but was working toward attending Lanphier on a full-time basis.

¶ 21    Defendant told Melcher she got along with her siblings, had a close relationship with her mother, and was working on a relationship with her father. As for her involvement with outside agencies, defendant claimed no prior treatment or involvement. Melcher informed the juvenile court defendant had been involved in two fights at the Peoria County Juvenile Detention Center on January 10, 2022, and January 11, 2022, but provided no other details regarding either incident.

¶ 22    Melcher testified she was aware of services offered to juveniles by the Illinois Department of Juvenile Justice (DOJJ) and indicated DOJJ had a facility for females at Warrenville with multiple services, including educational, substance abuse, vocational, mental health, and medical services. She believed the facility offered parenting classes and leisure activities. However, she provided no details regarding any of these services or information regarding how defendant would benefit from the services.

¶ 23 On cross-examination, Melcher provided no real explanation for how she determined defendant was at a high risk to reoffend. Her only explanation was that she used a disposition tool that had a series of six questions, defendant answered the questions, and then the risk level was generated based on the answers to the questions. However, Melcher acknowledged defendant had no prior adjudications, had never been arrested, had no criminal history, and was cooperative and had no issues at the Sangamon County Juvenile Detention Center. While Melcher indicated defendant was involved in two fights at the Peoria County juvenile detention facility and received a 35-minute "time out," Melcher offered no details regarding the fights other than to say they involved another peer or peers.

¶ 24 According to Melcher, because of defendant's good behavior, she was ranked at the highest level at the Peoria County juvenile detention facility, was offered educational services, and took advantage of those services. Melcher was unaware of what other services, like counseling, defendant was receiving or whether she was taking advantage of any other services she was offered. As for the services defendant would have available to her at the Warrenville DOJJ facility, Melcher indicated defendant would be able to participate in schooling, substance abuse programs, and mental health treatment. However, once again, Melcher provided no information as to what those programs or services would entail and stated she had no information indicating defendant would not be a willing participant in the programs offered at Warrenville.

¶ 25 The State next called Detective Charles Redpath of the Springfield Police Department, who was the lead detective in the investigation. According to Redpath, on November 17, 2021, he learned a stabbing had occurred after school on the west side of Lanphier's campus. Assistant principals Chris Barham and Brian Caton were advised of or observed a fight happening. Both men saw Pierre Scott coming back toward the school but were unaware he had been stabbed.

Barham told the police he observed defendant with a knife and heard her yell she did not "give a fuck, call who you want." Caton told the police defendant's last name and said students were pointing at her, saying she stabbed Pierre. Redpath testified Lanphier Principal Curtis "Artie" Doss told the police he saw the tip of a knife in defendant's hand, told her he had called the police, and told her to come with him. Doss overheard defendant say, "[C]all whoever you want, I hope he dies."

¶ 26 Redpath testified the police learned B.P., a Lanphier student, might have relevant information regarding what occurred. B.P. consented to a recorded interview with the police just hours after the incident. B.P. told the police he had been in "in-house" that day with Pierre and heard Pierre make statements that he was going to get in a fight. According to B.P., he was in the same area as Pierre after school. According to Redpath, B.P. told the police defendant only swung one time towards Pierre's chest, then he held his ribs and ran away. B.P. told the police defendant was a female who looked like a male, attended Washington Middle School at the same time as him, had the nickname "Tink," and was wearing a blue and white jacket.

¶ 27 Redpath also testified Michael Washington, who was supervising Pierre's "in-house" on the day Pierre was stabbed, also sat for a recorded interview with the police. In summarizing the interview, Redpath said Washington told the police Pierre was his normal, happy self that morning but went ballistic during the fourth period of the school day. Washington told Pierre to calm down and asked what was wrong. Pierre told Washington he did not want to say because Washington would try to talk him out of doing something. Washington told Pierre he must be planning on doing something he knew was wrong. Pierre agreed. Washington told the police Pierre was acting normally later that afternoon.

¶ 28 According to Redpath's testimony, Detective Jennifer Mack went to the hospital

when the police learned D.D. was also a victim. After Mack located D.D. and his mother, Krishawna A., D.D. told Mack he had been stabbed near the buses by a light-skinned girl wearing a coat and jeans. D.D. said Pierre was having an issue with a girl and he was with Pierre to make sure he was alright. D.D. said defendant swung first at Pierre, Pierre then swung back at defendant, and then defendant swung at D.D. According to D.D., he did not know why he was stabbed. D.D. also indicated the fight had something to do with defendant saying something about Pierre's deceased uncle.

¶ 29    Redpath testified the police acquired surveillance video from Lanphier and a school bus parked near the fight's location. According to Redpath, he had reviewed the video found in People's exhibit No. 4, which fairly and accurately depicted the surveillance video he saw during his investigation. The detective indicated video Nos. 16 through 20 were from Lanphier's surveillance cameras and then described what parts of the videos were relevant to the investigation. Redpath stated video No. 17 showed Pierre and D.D. come into view inside of the school's main lobby around the 1:54 mark and then exit the building 2 minutes into the video. Pierre was wearing dark pants and a dark jacket, and D.D. was wearing a white or light colored hoodie. Video No. 16 showed defendant exit the school around the 0:15 mark and then move to the middle of the screen. About 13 seconds later, defendant and another student begin walking toward 11th Street while defendant frequently looked back toward the school. A little over one minute into the video, defendant walked back toward the school.

¶ 30    The State then directed Redpath's attention to video No. 18, which was the same camera angle contained in video No. 16. Redpath testified defendant walked into view around the 0:07 mark. Approximately 17 seconds into the video, Pierre and D.D., who are visible on the video, moved toward defendant. Then, 34 seconds into the video, Pierre and D.D. were talking to

defendant, who was mostly off-screen. Redpath testified Pierre's and D.D.'s respective hands were down along their sides during the conversation. According to the detective, Pierre and D.D. then began walking toward 11th Street.

¶ 31 Redpath then testified video No. 19, which was from an exterior surveillance camera pointed toward Lanphier's main entrance, encompassed what happened in video No. 18 and what occurred after defendant, Pierre, and D.D. moved out of frame in video No. 18. Video No. 19 included a partial view of what happened both before and after the stabbings occurred but did not show defendant stab either Pierre or D.D. Redpath indicated his time frame of concern in video No. 19 started around the four-minute mark, which is where the State started the video for the juvenile court. Redpath testified defendant was on the video, walking backward between Pierre and D.D. Then, at some point, defendant broke away from Pierre and D.D.

¶ 32 According to Redpath, after defendant separated from Pierre and D.D., defendant was walking in one direction, and Pierre and D.D. were walking in another direction. By the 4:30 mark, defendant, Pierre, and D.D. could no longer be seen. Approximately 24 seconds later, Pierre came back into view, running toward the school, fell, got up and removed his jacket, then fell a final time.

¶ 33 The State then directed Redpath's attention to surveillance video from a school bus parked along 11th Street, just west of the location where defendant stabbed Pierre and D.D. Redpath testified the time frame of his investigative concern in the video was a 22-second period from 1:26 to 1:48. Although the bus surveillance video included three different camera angles, Redpath directed the juvenile court's attention to the parts of the screen labeled "STEP" and "REAR." According to Redpath, the video labeled "STEP" would show defendant walking into the frame in the grass between the sidewalk and road wearing dark pants and a black and white

jacket at the 1:26 mark. Then, at the 1:31 mark, defendant would walk into the paths of Pierre and D.D.—who Redpath said were walking in the same direction as defendant—and then turn and face the young men. Redpath testified, "[Defendant] was walking at a faster pace, got in front of them[,] *** and cut them off."

¶ 34     The State then started the bus surveillance video at the 1:20 mark and asked Redpath to indicate when he saw defendant, Pierre, or D.D. Redpath testified defendant could be seen before Pierre and D.D. Moments later, defendant turned to face Pierre and then struck him in the chest while his hands were down. According to Redpath, after defendant struck Pierre, they separated. Then, after D.D. ran toward defendant, she struck D.D. The State and Redpath then had the following exchange:

"Q. Okay. So as far as you are concerned with this video in particular, you are most concerned of approximately a ten to twenty second period of time?

A. Yes.

Q. Starting at approximately a minute thirty and ending around a minute forty, a minute forty-five?

A. Correct."

The State then played the video again. Thereafter, at the juvenile court's request, the State played the video frame-by-frame, through a different video player, starting at the 1:28 mark.

¶ 35     Next, the State asked Redpath about video No. 20, which was from an exterior surveillance camera at Lanphier showing both 11th Street and North Grand Avenue. Redpath testified the area of his investigative concern started around the 7:53 mark and ended just under 3 minutes later. He identified a white vehicle in a parking lot across North Grand Avenue that belonged to and was driven by Krishawna A., D.D.'s mother. Krishawna told the police she

normally parked there to pick up D.D. after school. Around the 8:30 mark of the video, a large group of students ran north toward the fight. Around the 8:49 mark, Redpath said defendant could be seen on the west side of 11th Street, running south toward North Grand and then southwest at the intersection. Defendant ran in front of Krishawna's vehicle. Around the nine-minute mark, another young man runs across the intersection and taps on the window of Krishawna's vehicle. Defendant had stopped along North Grand Avenue but then continued out of view. Redpath indicated D.D. could later be seen in the parking lot with his mother. According to the detective, after D.D. left with his mother, the scene was still chaotic, and the video shows students running after defendant.

¶ 36　　　　During defense counsel's cross-examination of Redpath, the detective testified B.P. told the police he was in the same "in-house" with Pierre, Pierre was upset during the "in-house," and Pierre's comments and mannerisms indicated Pierre was going to get into a fight with someone. However, B.P. did not know who Pierre planned to fight. According to B.P., Pierre was very angry about a social media post that mentioned Pierre's deceased uncle.

¶ 37　　　　Defense counsel then turned Redpath's attention to video No. 18, which showed defendant standing on the left side of the screen, Pierre and D.D. exiting the building, and D.D. pointing at defendant. Defense counsel asked Redpath if it was fair to say the young men were pursuing defendant at that point. Redpath answered, "I would say it's fair to say that they were going to have a conversation between each other. Both parties were going to meet up." When defense counsel asked the detective why he thought defendant was looking for Pierre and D.D., Redpath said defendant kept looking over her shoulder toward the school. Defense counsel then asked if defendant could have been looking for her sister. Redpath indicated defendant's sister was on the surveillance video.

¶ 38 With regard to video No. 19, Redpath acknowledged defendant was walking backward and Pierre and D.D. were walking towards her. Further, defense counsel played video No. 18 and pointed out someone other than Pierre and D.D. walked at a fast pace toward defendant. Redpath acknowledged B.P. told him that Pierre and two other young men had pursued defendant after she walked away from them. Further, Redpath acknowledged defendant was 15 years old when she stabbed Pierre and D.D., who were both either 17 or 18 at the time.

¶ 39 When defense counsel questioned Redpath about his interview with Washington, Redpath acknowledged Washington said he was supervising Pierre's "in-house" classroom, Pierre went "ballistic," and Pierre refused to tell Washington what he planned to do because Washington would try to talk him out of it. After defense counsel asked Redpath if he believed Pierre intended to fight, hurt, or confront defendant in some way, Redpath testified, "I think it's fair to say that they were going to have a conversation." After Redpath acknowledged B.P. thought Pierre intended to fight a girl after school, B.P.'s recorded interview with the police was played for the juvenile court. However, it is not clear from the record if anything other than the first five minutes of the recording was published.

¶ 40 Based on this court's review of the first five minutes of the audio recording, B.P. said he was a sophomore at Lanphier and had been in "in-house" with Pierre that day when the fire alarms were going off. Like Pierre, B.P. said he went outside during the fire alarm and then went back to "in-house." B.P. told Redpath and Detective Howard that Pierre was talking about fighting a person—presumably a female—at the end of the school day because of something that happened with Pierre's deceased uncle. When school dismissed for the day, B.P. was outside and saw Pierre and "two other dudes" walk up to defendant. When defendant walked away, Pierre and the two other young men followed her. B.P. said he saw defendant swing and then saw Pierre run

- 15 -

away holding his ribs, saying he had been stabbed. According to B.P., defendant had on a blue and white coat and blue and white "Air Max 95" shoes.

¶ 41    Redpath also acknowledged D.D. said Pierre and a girl were "beefing" and D.D. was present to make sure Pierre was alright. According to Redpath, both B.P. and D.D. said the fight involved mutual combat. In addition, Redpath admitted video evidence showed Pierre and D.D. walk out of school and then walk directly toward defendant. The detective also agreed the altercation involved a 15-year old female against a 17-year old young man and an 18-year old young man. Redpath also acknowledged defendant had no criminal history to his knowledge and turned herself in to the police.

¶ 42    On redirect examination, the State asked Redpath about B.P.'s and Washington's respective interviews with the police. As for B.P.'s claim Pierre was with two other young men outside the school, Redpath said in the following exchange he only saw one person with Pierre and implied no one followed defendant when she walked away:

        "Q. And in regards to [B.P.] as we have heard on this recording, he indicated
        that there were—that it was Pierre and two other dudes that walked up to
        [defendant]; is that what he said?

        A. Yes.

        Q. You have been able to review now all of the outside surveillance videos
        of Lanphier *** relating to this incident; is that correct?

        A. Yes.

        Q. And in that video, do you ever see Pierre and two other individuals
        approach [defendant]?

        A. No.

"Q. And in that same reporting, [B.P.] indicates that [defendant] walks away and they follow her; is that what he indicated?

A. That is correct.

Q. And on the surveillance video that you have been able to personally review, do you see Pierre Scott and [D.D.] following [defendant]?

A. All three of them were walking off campus and then eventually separated."

Redpath also testified B.P. said defendant was the only person who swung during the encounter. According to Redpath, the video evidence showed B.P.'s statement was not accurate because Pierre tried to swing back at defendant after he was stabbed and then defendant stabbed D.D.

¶ 43    Then, the State asked if Redpath recalled asking Washington if B.P. was in the "in-house" he was supervising on November 17, 2021. Redpath said he did not recall doing so. However, Redpath said he had reviewed Detective Howard's supplemental police report prior to his testimony. The State marked the report for identification as People's exhibit No. 5 and showed it to Redpath. Thereafter, the State and Redpath had the following exchange:

"Q. Could I have you turn to page number four, please. And I'll direct your attention towards the middle paragraph of number four. And if you could just read that to yourself for just a moment.

A. Okay.

Q. Detective, based on your—is—is your memory now refreshed in regards to the conversation that you had with Mr. Washington, along with Detective Howard?

A. Yes.

- 17 -

Q. In that conversation, did you have an opportunity to discuss whether [B.P.] was present in in-house?

A. Yes, I asked him and he said he was in in-house yesterday.

Q. Being November 16th and not November 17th?

A. That's what was said."

According to Redpath, Washington said it was during fourth period that Pierre went "ballistic." The State and defense counsel both indicated neither had any further questions for Redpath. The juvenile court allowed defense counsel to admit B.P.'s interview.

¶ 44        After the State rested and the defense called no witnesses, the parties made their respective arguments on the transfer petition. According to the State, while not everything regarding why the stabbings occurred was known, defendant clearly stabbed both Pierre and D.D. Further, while acknowledging Pierre was "ballistic" during fourth period, the State argued Pierre had calmed down and was acting normally later in the school day.

¶ 45        According to the State, defendant was waiting after school to meet Pierre and D.D. After defendant, Pierre, and D.D. found each other and exchanged words, the State suggested they all walked away. The State argued Pierre and D.D. were acting like the other students trying to leave the school grounds. However, according to the State, defendant was acting differently, moving backward while continuing to converse with Pierre and D.D. Then, defendant separated from Pierre and D.D., and they were all moving toward 11th Street adjacent to one another. Relying on the school bus's surveillance video, the State argued defendant closed off the gap between herself and Pierre and D.D., walking faster and parallel to Pierre and D.D. Defendant then turned and stepped in front of D.D. and Pierre and stabbed Pierre in the heart, causing his death.

¶ 46        The State then argued defendant committed the charged offenses, her acts were

aggressive even if not premeditated, and she was not charged through an accountability theory. According to the State, the evidence established probable cause for the charged offenses. Further, while defendant did not have any prior juvenile adjudications, the State noted she had been referred to Sangamon County court services for two different batteries in February 2019, both of which concluded with an informal station adjustment.

¶ 47 In addition, the State noted the evidence established defendant had a fairly good relationship with her family without abuse or neglect. While the State acknowledged defendant had cognitive issues, the State argued Eckert's report did not indicate defendant's cognitive delays contributed to the charged offenses. Further, according to the State, the results of defendant's personality assessments showed she was withdrawn, isolated, had a negative view of herself, and had "significant generalized delinquent tendencies and an underlying predisposition to break social rules and act out antisocially." The State noted Eckert diagnosed defendant with persistent depressive disorder and oppositional defiant disorder and recommended defendant have a skilled and experienced therapist to work with her on a long-term basis. Eckert also recommended defendant be monitored during her treatment to make sure she understood what was happening. According to the State, while Eckert indicated defendant believed she needed therapy, the State argued the therapy would proceed well into defendant's adult years.

¶ 48 With regard to the advantages of treatment within the juvenile justice system, the State contended defendant would not be eligible for probation even if she remained in the juvenile justice system and her sentence would run until she turned 21. While she would have access to mental health, substance abuse, clinical, and educational services if her case remained in the juvenile justice system, those services would stop when she was 21. The State argued the public would not be safe if defendant's sentence ended on her twenty-first birthday. As for the possible

sentence defendant faced if transferred to the criminal court, the State told the juvenile court the sentencing range for first degree murder was "20 to 60 years served at one hundred percent." The State then asked the juvenile court to transfer defendant to criminal court.

¶ 49 Defense counsel argued the transfer petition should be denied. According to defense counsel, defendant had no prior adjudications or prior arrests, Eckert indicated defendant would not seek out conflict, and this was not a situation where defendant ambushed Pierre and D.D. Instead, Pierre and D.D. came out of the school, pointed at defendant, and then approached her. Counsel also pointed out that Pierre had gone ballistic in "in-house," saying he was going to get into a fight and refusing to tell Washington what he planned to do because he knew it was wrong. Counsel also pointed out defendant was walking backward after she was confronted by multiple young men.

¶ 50 According to defense counsel's argument, the juvenile court did not know what was said on those videos between defendant and the young men, and counsel noted, "There's a gap between when everybody disappears and then the bus video." Further, defense counsel pointed out the court was presented with evidence this situation involved mutual combat. Finally, defense counsel argued defendant acted without premeditation, had significant mental limitations, was a candidate for rehabilitation, would take advantage of services offered to her, and did not pose a threat to the community. Counsel further contended defendant's aggression in this case was a reaction to real aggression toward her or aggression she perceived by older young men.

¶ 51 In rebuttal, the State argued B.P.'s statement to the police that Pierre and two other young men "were coming at" defendant was contradicted by the video evidence. The State also maintained this was not the only issue with B.P.'s police interview. According to the State, Pierre and defendant had an issue, and they were going to address it outside the school. In addition, the

State asserted defendant was the person acting aggressively and in an unreasonable manner and the treatment she needed would last long past the day she turned 21.

¶ 52     When explaining its decision, the juvenile court recognized it needed to consider numerous factors and give the greatest weight to the seriousness of the alleged offense and the minor's history of delinquency. The court noted Eckert's report was "illuminating" with regard to the issues it needed to consider. As for defendant's educational history, the court noted defendant's many failing grades and poor attendance dating back to the 2018-19 school year. The court also stated the evidence showed defendant often put her head down and refused to work on assignments in class and attend language therapy multiple times during the 2018-19 school year.

¶ 53     The juvenile court further noted Eckert testified defendant's attendance issues affected her capabilities. However, the court also stated defendant was oriented to person, place, time, and situation; her presentation matched her chronological age; the evidence did not indicate she had a formal thought disorder; and her ability to sustain her attention, concentrate, and exert mental control was better developed than her reasoning skills.

¶ 54     As to whether DOJJ could adequately deal with defendant's issues, the juvenile court noted Eckert's report stated defendant's therapy would likely be challenging and characterized by frequent therapeutic reversals. According to the court, in addition to defendant's receptive language skills being very poorly developed, she had oppositional defiant disorder, problems with authority, trust issues and would need "several years of work to facilitate integration and stabilization of her behavior." Further, the court noted defendant had a moderate level of social immaturity, simplistic and naïve coping skills and social judgment, and appeared to lack insight and empathy. According to the court, defendant's mistrust of authority figures would likely lead to hostility. Further, defendant had failed to take advantage of opportunities presented through the

school district with regard to her mental health, educational health, and language comprehension in the past.

¶ 55       The juvenile court recognized it needed to consider the advantages of treatment within the juvenile justice system and defendant's history of delinquency. As to the advantages of treatment within DOJJ, the court stated as follows:

> "There was limited testimony about this but in regards to the advantages within the juvenile justice system, I think there was one time that if there is an adult sentence in this case where [defendant] will be able to take care of the advantages, if there are any, in the juvenile justice system."

However, the court then also noted defendant's treatment is "likely to take more time than [defendant] would be under the jurisdiction of the juvenile court in a purely juvenile court situation."

¶ 56       As for defendant's history of delinquency, the juvenile court stated it looked at nonadjudicated offenses "at a different level than adjudicated offenses and history." However, the court then stated:

> "I can't completely ignore the factors involved and all the factors involved in regards to the non-court intervention in relationship to the battery and the aggravated battery. At the very least, those should have been a wake-up call where she should have taken advantage of the services that were offered through the school district and I imagine through court services, as well. And that didn't happen. That is a previous history. And it fits in not only in regards to delinquent behavior but it fits with the findings in regards to the defiance and lack of empathy and unwillingness to engage in services, as do the more recent activity while she

- 22 -

was in the detention center on this charge itself."

¶ 57　　The juvenile court then turned its attention to the circumstances of the events in this case, stating:

"[W]e have advantages now with video and I do not find for the video reasons, as well as the inconsistencies in regards to B.P.'s testimony, or at least his statements to the police, that they're that credible. I did watch the videos. I didn't see three people. I saw the two victims approach [defendant]. I saw [defendant] at the front of the building go and walk away with a friend and then come back and wait. Yes, I agree the two victims pointed at [defendant] and then approached her. I was surprised at such a low level of confrontation at that point. I don't find that the victims followed her. They walked up on somewhat divergent paths. And I—there was some period of time where you can't see where the individuals go. I don't gather it to be very long. But I can see the reaction and what everyone is doing as we then recapture what's going on at Lanphier High School. And clearly the two victims are walking in a casual manner without any hostility to anyone.

I think that if they didn't have their hands in their pocket, that they certainly had their hands by the side. No one was agitated.

And the video clearly shows [defendant] coming up against and striking the victim without any provocation at all.

[D.D.], then, in this Court's opinion, tries to defend his friend and he gets stabbed and all that happened within, I don't know, five seconds, three seconds. It was very quick. And that's why this Court looked at that.

So who was aggressive, no doubt [defendant] was aggressive. And I'm

- 23 -

relying on that video. And I don't know how to interpret it any other way."

¶ 58 Later, when discussing probable cause and premeditation, the juvenile court found that, as defendant approached the two young men, she had the intent to stab one of them and it happened quickly and without confrontation. According to the court, "There [was] no escalation. There [were] no comments made to each other[,] it's bang." The court noted Pierre's reaction to getting stabbed was defensive in nature. As for D.D., the court said he was "a little more aggressive," but he had just seen Pierre get stabbed. The court found D.D. was trying to help and protect Pierre and was also stabbed. Defendant then walked off without remorse.

¶ 59 The juvenile court also explained the charged offenses occurred on school grounds and upset the community. Given Eckert's report and conclusions, the court found it was not reasonably likely defendant could be rehabilitated before the juvenile court's jurisdiction expired. In addition, the court found punishment through the juvenile court system would be "wholly inadequate" because of the circumstances and severity of the offenses. The court indicated defendant was charged with the most serious offense that can be brought before a court, defendant was not charged through an accountability theory, and defendant clearly caused Pierre's death and D.D.'s serious bodily injuries with a deadly weapon. As to the possible sentence defendant faced in criminal court, the court stated it was aware defendant could be sentenced to between 20 and 60 years in prison for first degree murder. The court then entered an order allowing defendant to be transferred out of juvenile court and prosecuted under the criminal law.

¶ 60 B. Criminal Court

¶ 61 On April 13, 2022, a grand jury indicted defendant on three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)), two counts of unlawful use of a weapon (*id.* § 24-1(a)(2)), three counts of aggravated battery (*id.* § 12-3.05(a)(1), (c), (f)(1)), and one count of

attempt (first degree murder) (*id.* § 8-4, 9-1(a)(1)). On December 20, 2022, defendant filed a notice she might raise self-defense as an affirmative defense. On January 18, 2023, defendant filed another notice, indicating she might also raise "imperfect self defense/second degree murder— belief in justification" as an affirmative defense. On February 9, 2023, defendant signed a written waiver of her right to a jury trial, and the trial court accepted her waiver.

¶ 62        Defendant's bench trial began on February 14, 2023. Defendant was still represented by the same attorney. The State was represented by First Assistant State's Attorney Derek Dion and Assistant State's Attorney Kendra Hansel. Hansel had handled the hearing on the State's petition to transfer defendant to criminal court. The fact defendant stabbed Pierre and D.D., causing Pierre's death and D.D.'s serious injuries, was not subject to any real dispute. For that and other reasons, we need not specifically describe the entirety of the events at defendant's trial and will only provide a summary of the facts relevant to the disposition.

¶ 63        D.D. testified he was 17 years old and attended Lanphier High School from 2019 until he graduated in December 2022. On November 17, 2021, when he and Pierre were stabbed by defendant, he stated he was approximately 5 feet, 9 inches tall and weighed between 120 to 125 pounds. We note his testimony is difficult to understand, as he frequently contradicted himself and claimed he remembered very little of what happened.

¶ 64        When asked if he and Pierre talked to anyone outside, D.D. said he and Pierre talked to defendant. When asked why they talked, D.D. said Pierre "was telling me something, I don't remember." When D.D. was asked how Pierre was emotionally at that time, D.D. responded, "I don't know he was like quiet, I knew something was wrong with him." When asked if Pierre indicated what was upsetting him, D.D. replied it was "[s]omething about a video, I don't know." Pierre said he saw about a second of the video but did not remember what he saw. From our review

of the record, although it is not entirely clear, it appears D.D. was referring to what happened during one of the fire alarms.

¶ 65     Later, D.D. testified that when he and Pierre left the school building at the end of the school day, he pointed out defendant to tell Pierre that defendant "was right there." The following exchange between the State and D.D. followed:

"[The State]: Where did you guys go from there?

[D.D.]: Down the sidewalk.

Q. Okay. Do you remember having another conversation with her at that point?

A. No, not really. It wasn't a conversation that I could hear. I wasn't talking.

Q. Okay. Who was talking?

A. I wasn't talking. Pierre and her was probably talking. I wasn't talking."

D.D. said he did not see anyone with a weapon. When asked what happened after that point, D.D. replied, "I don't remember for real after that." However, when D.D. was then asked what happened before he was stabbed, he testified he was walking and then Pierre and defendant were fighting. D.D. indicated he did not see defendant with a knife. When asked what happened next, D.D. said defendant and Pierre separated for a second. D.D. indicated he "came up" because he saw Pierre "go back." D.D. testified he was then stabbed in the chest. According to D.D., he did not think he hit the person who stabbed him.

¶ 66     On cross-examination, D.D. said he and Pierre exited Lanphier on the Converse Street side of the building during one of the fire alarms before school dismissed for the day. At that time, Pierre and defendant talked. D.D. said he "was in the distance" and denied hearing what was said. D.D. indicated that after the fire alarm, he saw about one second of the video that angered

Pierre. D.D. testified defendant had no reason to be upset with him that day.

¶ 67        While D.D. did not remember if he was in "in-house" with Pierre during fourth hour, he did remember his mother was waiting for him after school south of North Grand Avenue. Additionally, D.D. claimed he did not remember much of what happened between the time he pointed defendant out to Pierre until defendant and Pierre had their fight.

¶ 68        D.D. said he did remember telling the police he did not know how he got stabbed and saying he must not have been paying attention. He also remembered moving toward defendant and swinging at her after she and Pierre separated. However, he denied defendant was moving backward and away from him when he moved towards her. With regard to why he was with Pierre, D.D. said Pierre was his friend and they were all walking in the same direction. Pierre lived south of Lanphier, down 11th Street, and D.D.'s mother was parked south of North Grand Avenue, at the intersection of North Grand Avenue and 11th Street.

¶ 69        After D.D. testified, the parties stipulated People's exhibit No. 11, which was the Lanphier surveillance videos, and People's exhibit No. 12, which was the First Student bus surveillance video, fairly and accurately depicted the events that occurred on November 17, 2021.

¶ 70        Redpath also testified at defendant's criminal trial. Some of his testimony was similar to the testimony he provided at the transfer hearing. However, parts of his testimony were also significantly different. As a result, we need not repeat all of the information Redpath provided at the transfer hearing.

¶ 71        During Redpath's direct examination, the State questioned Redpath about multiple surveillance videos in People's exhibit No. 11, which were admitted into evidence without objection. The State indicated it intended to publish a portion of the videos, which it did. We have already described Redpath's testimony regarding some of these videos at the transfer hearing and

only discuss them as necessary.

¶ 72    Although Redpath claimed he did not know when defendant came into possession of the knife she used to stab Pierre and D.D., Redpath testified he believed defendant was in possession of a knife inside the school in video No. 11, around 2:06 p.m., based on her behavior, the positioning of her hands, and her constant checking of the right side of her body. At the criminal trial, contrary to his testimony at the transfer hearing, Redpath testified J.W., who was wearing red pants, was with Pierre and D.D. in video No. 17 when they left the school building and video No. 18 when they were outside the building.

¶ 73    The State then turned its attention to video No. 19, which was from an exterior camera facing northeast toward Lanphier's main entrance. It appears the State played video No. 19 from the 2:14 mark when questioning Redpath. When asked where defendant was in the video, Redpath testified she paused "right here" (without describing for the record where "right here" was at) and then moved behind a tree where she could not be seen at the 2:36 mark. When the State stopped the video at the 3:30 mark, Redpath indicated Pierre and D.D. were "right here in almost the middle [of the screen], just off to the left of the sidewalk by the benches." At that point, according to Redpath's testimony, defendant, Pierre, and D.D. were having some sort of conversation. The State then continued playing the video. Redpath testified that at the 4:02 mark, defendant, Pierre, and D.D. started to move toward the camera. Redpath identified D.D. on the video by his white hoodie. Then at the 4:19 mark, Redpath indicated defendant was in the grass to the left of the sidewalk, Pierre was "[j]ust to the right of her," D.D. was "[j]ust to the right of Pierre," and J.W. was on the sidewalk. Redpath noted all the relevant parties were off the screen at the 4:35 mark. He then identified Pierre running back toward the school around the 4:57 mark.

¶ 74    Because Redpath's testimony regarding what video No. 19 showed from the 2:14

- 28 -

mark was very sparse, we deem it necessary to provide a fuller description of what the trial court would have seen on the video starting at the 2:14 mark. At that point in the video, defendant turns away from the student she had been walking with toward 11th Street and starts walking back toward the school, hangs around near the left side of video, then starts walking back toward the school building at the 2:56 mark. Around the 3:19 mark, defendant has stopped by a tree and cannot be seen.

¶ 75 Shortly thereafter, D.D. can be seen outside the main entrance, pointing toward defendant's location. Around the 3:35 mark, D.D. and Pierre can be seen near defendant. It appears D.D.'s right hand is up by his head. Around the 3:52 mark, J.W., who is wearing red pants, can be seen a few feet to the right of the tree that was blocking the camera's view of defendant. Around the 3:54 mark, Pierre and D.D. can be seen to the left of the tree, and J.W. is walking on the camera side of the tree toward Pierre and D.D.

¶ 76 At the 3:55 mark, defendant comes into view, walking backward and away from the three young men. Initially, defendant took a couple of steps backward, moving southeast. Pierre and D.D. then moved toward her and the school building, not 11th Street, as they walked around the northeast side of the tree. Defendant then started moving to the southwest, still walking backward and away from Pierre and D.D. The two young men then changed their direction of travel and followed after defendant. D.D. can be seen making movements with his hands toward defendant and makes a quick step or flinch toward her at the 4:05 mark of the video.

¶ 77 In the next few moments, J.W. walked behind defendant as she continued walking backward. It does not appear defendant was watching J.W.'s movements. Instead, she was looking toward Pierre and D.D., who continued to walk toward her as she walked backward. At the 4:15 mark of the video, after defendant had been walking backward for nearly 20 seconds, away from

Pierre and D.D., defendant moved forward between the two young men while continuing to look at Pierre. Pierre stopped and turned toward defendant as she went between him and D.D. Then, D.D. moved toward defendant before he and Pierre started walking to the west/southwest while still looking at defendant. Defendant then made a little movement with her left hand, and Pierre and D.D. started walking away from defendant while still looking at her.

¶ 78        In the video, defendant's right hand was in her coat pocket while she was walking backward and away from Pierre and D.D. and while she was in close proximity to the young men. However, after Pierre and D.D. began walking to the southwest and defendant was north of them, defendant removed her right hand from her pocket as she was moving off the left side of the video screen.

¶ 79        Later, the State turned to the school bus's surveillance video (People's exhibit No. 12), which was admitted into evidence without objection. The State directed the trial court's attention to the portion of the video labeled "STEP" and started the video one minute into the footage. Unlike at the transfer hearing, Redpath testified D.D. could first be seen in the first window of the bus wearing a white sweatshirt and J.W. could be seen behind D.D. Although not noted by Redpath, Pierre can also be seen in the video with J.W. and D.D. when they turn and start walking north toward defendant's location when she could no longer be seen in video No. 19. Redpath testified defendant can be seen in the grass on the video at the 1:31 mark. The State then played the video and stopped it at the 1:53 mark. Redpath said the video showed defendant stabbing both Pierre and D.D. According to Redpath, Pierre's hands were down when defendant stabbed him. The State also introduced two cell phone videos that captured part of the incident or its aftermath. One video appears to start when defendant stabs D.D. The other video does not capture either stabbing but does show multiple school buses lined up along 11th Street.

¶ 80　　　On cross-examination, Redpath acknowledged the State had no evidence defendant knew or was familiar with Pierre or D.D. before the day in question. Further, according to Redpath, Pierre was upset about the video that defendant and her younger brother posted online, although the video was not directed at Pierre but instead at his younger brother and uncle. Redpath testified Pierre was aware of the video based on his outburst during the fourth period of the school day while in "in-house." According to Redpath, Washington told the police Pierre would not tell him what he was upset about. However, Redpath testified B.P. told the police Pierre said a girl had him "fucked up" because of something involving Pierre's deceased uncle.

¶ 81　　　Redpath also testified D.D.'s mother was parked in a lot at the southwest corner of the intersection of 11th Street and North Grand Avenue. According to the detective, defendant lived on North 8th Street and would have walked south down 11th Street from the school toward North Grand Avenue to walk home. He explained J.W., who was a senior at Lanphier, was in close proximity to everything that happened after school between defendant, Pierre, and D.D. but refused to be interviewed by the police about the incident.

¶ 82　　　The detective also indicated that after Pierre, D.D., and J.W. exited the school building and walked over to where defendant was standing, defendant took a step backward and put her hands out and her palms up. Redpath said he saw no evidence at that point that defendant knew either Pierre or D.D. According to Redpath, the young men and defendant then had a conversation. Then, defendant started to move backward, and the boys were walking in the same direction. The detective also testified defendant never turned her back to either Pierre or D.D. In addition, Redpath acknowledged D.D. lunged or flinched at defendant while she was walking backward. Defendant reacted by taking a step away from D.D.

¶ 83　　　Redpath conceded defendant was not being the aggressor at that point, but he did

not characterize D.D.'s lunging or flinching movement at defendant as aggressive, either. Instead, according to Redpath, D.D.'s "action was to get [defendant] away from him." However, Redpath admitted the lunging or flinching move could be seen as an act of aggression. When defendant continued to walk backward, Redpath acknowledged Pierre began to walk to defendant's left, and D.D. began to walk to her right before defendant moved forward between the two young men while facing Pierre the entire time. Pierre also turned so he was facing defendant during her movement. According to Redpath, defendant had been walking backward for around 20 steps before she moved forward between Pierre and D.D.

¶ 84　　　　　Redpath acknowledged defendant then removed her left hand from her pocket and made a motion that could be perceived as dismissing the two young men. The detective testified D.D. and Pierre were still looking toward defendant and things were being said. Redpath conceded defendant was not following D.D., Pierre, and J.W.

¶ 85　　　　　Defense counsel also questioned Redpath about the school bus's surveillance video and asked Redpath if he could think of any reason why D.D., Pierre, and J.W. would have turned north back toward defendant's position instead of walking south on the sidewalk toward D.D.'s ride and Pierre's home. Redpath said the only reason he could think of was because someone might have said something. Redpath acknowledged defendant had a reason to be walking south on the sidewalk along 11th Street because she lived in that direction. He also testified after defendant— who was walking south—passed Pierre and D.D.—who were walking north—the young men then turned and started walking south, following defendant in close proximity.

¶ 86　　　　　Defense counsel then asked Redpath what happened when defendant struck Pierre. Redpath said Pierre was walking toward her and his hands came up to his chest, but he did not strike her back. Redpath did not know what was being said at that time. D.D. provided the police

no information about anything that was said, and J.W. refused to talk to the police. Redpath indicated he did not know if the young men were threatening her or saying they were going to harm her. When defense counsel asked Redpath why the three boys would have turned north on the sidewalk and then turned south after defendant passed them, Redpath said it was his opinion they did not want to turn their backs on defendant. However, he acknowledged the young men could have avoided the situation entirely if they had not turned north toward defendant.

¶ 87        Further, Redpath conceded D.D. sprinted at and took a swing at defendant after defendant struck Pierre. Redpath characterized this as an aggressive action. Redpath also acknowledged defendant was moving backward after striking Pierre. Further, Redpath testified he assumed D.D. did not know Pierre had been stabbed or defendant had a knife when he sprinted at defendant. Redpath also admitted a fourth young man wearing bright red pants and a black hoodie, who Redpath could not identify, also appeared to be pursuing defendant before realizing she had a knife. According to Redpath, people only started retreating away from defendant when they realized she had a knife.

¶ 88        Redpath also explained the area where defendant lived could be dangerous for a 15-year-old girl to walk by herself. Further, the detective also stated it would be dangerous for a 15-year-old girl to walk by herself from Douglas to Lanphier. As for whether defendant had a motive to kill Pierre and seriously injure D.D., Redpath testified the police had no evidence of a motive. Finally, the detective noted the police also found a knife in defendant's sister's bag, which was dropped at the scene that day.

¶ 89        On redirect examination, Redpath testified he was not able to talk to Pierre about whether defendant had a motive to harm him. Further, he declined to say defendant was retreating by walking backward because of her prior action of walking back toward the school building after

walking toward 11th Street with another student. Redpath also noted that defendant was keeping pace with Pierre and D.D. while walking backward. According to the detective, other than D.D. flinching at defendant, he did not see D.D., Pierre, or J.W. take any aggressive action in the surveillance videos prior to defendant stabbing Pierre. Redpath noted no one had hit or kicked anyone before defendant stabbed Pierre. He also testified defendant swung at D.D. before D.D. swung at her. However, on re-cross examination, Redpath agreed D.D. running at defendant was an aggressive act.

¶ 90　　　　The State rested after the detective's testimony.

¶ 91　　　　B.P. was called as a defense witness and testified he was a sophomore at Lanphier on November 17, 2021. He did not know if he was in "in-house" with Pierre during fourth hour on the day in question, which was when Washington said Pierre had gone ballistic. However, B.P. said he was in "in-house" with Pierre at the end of that school day. B.P. testified he sat for an interview with the police on November 17, 2021, and provided accurate information to the police. According to B.P., his memory of what occurred that day would have been better the night he spoke to the police as opposed to the day of his testimony. B.P. told the police Pierre was very mad and loudly talking about fighting someone after class—shouting "this bitch got me fucked up"—because of something that happened with Pierre's uncle. Further, B.P. said this was unusual behavior for Pierre. While B.P. did not know who Pierre planned to fight, he testified he thought Pierre was talking about fighting a female whenever he saw her.

¶ 92　　　　With regard to what B.P. saw outside the school building, defense counsel and B.P. had the following exchange:

　　　　　　"Q. And did you see Pierre and two other individuals with him exit that same exit?

A. No, I seen him walking when I got out with one of his friends.

Q. Okay. You didn't tell Detective Redpath that you saw Pierre and two other dudes walk up to the Defendant ***?

A. No. It wasn't two other people. He was with one other people and they, like, walked up to each other.

Q. Okay. Do you recall telling Detective Redpath that—well, let me ask you this: When you say; she walks away and they follow her. Do you recall saying those statements?

A. Huh-uh.

Q. Are you denying that you said those statements?

A. No, because I don't remember if I said it or not.

* * *

Q. Okay. Can you tell me what you witnessed from where you were at?

A. I had walked—there is like three sections when you walk out those 11th Street doors. I walked down the middle section and I was looking back because there was, like—you could tell there was an argument. They were arguing. And they were walking up to each other and they were, like, just sitting there talking, so I kept walking. And that's when I saw her swing and Pierre yelling out that he was stabbed and running back and forth."

B.P. indicated he had been interviewed before trial by the state's attorney's office on February 8, 2023. The State did not play B.P.'s recorded interview for him, and he did not know if his February interview was recorded. B.P. again agreed his interview with Detective Redpath on the day of the incident would be more accurate as to what he observed that day.

¶ 93    On cross-examination, B.P. said he saw defendant swing and Pierre run away. When asked if he saw anyone else swing, B.P. said it looked like Pierre's friend had swung, but he could not tell for sure. B.P. also said he was not completely sure if defendant swung first or if Pierre's friend swung first.

¶ 94    Defense counsel noted the parties had stipulated Defendant's exhibit No. 1, which was Michael Washington's recorded interview on November 18, 2021, would be admitted as his testimony. The recording of the interview was then played for the trial court.

¶ 95    Afterwards, defendant testified on her own behalf. According to defendant, she was attending Douglas in the morning and Lanphier in the afternoon and lived on 8th Street on November 17, 2021. To get from Douglas to Lanphier, she either rode a bus or walked if necessary. After leaving Lanphier at the end of the school day, she would either walk home or someone would pick her up. On the day of the incident at issue, she rode the bus from Douglas to Lanphier, but no one was available to pick her up after school.

¶ 96    While she was at Lanphier, a fire alarm went off and she exited the north side of the building. While outside, she heard someone yelling. She looked and saw a young man she later learned was Pierre staring at her. She looked to see if Pierre was looking at someone behind her. Pierre then yelled he was talking to her. After he stood there for a second, she walked off and started talking to someone else. Defendant claimed she did not know D.D., Pierre, or J.W. prior to November 17, 2021.

¶ 97    According to defendant, her younger brother had been having problems with another boy before November 17, 2021. Defendant's brother and the other boy attended Washington Middle School together, the boy had been bullying her brother, and they had an altercation at the YMCA. Defendant admitted she and her brother made a Snapchat video directed

at the alleged bully prior to November 17, 2021. According to defendant, she did not know the alleged bully was Pierre's brother or that the boy even had an older brother.

¶ 98          According to defendant, when school dismissed shortly after the fire alarm on November 17, defendant left the school and was waiting for her sister but never saw her. While defendant was standing outside, Pierre and D.D., who she did not know at the time, confronted her. Defendant testified Pierre accused her of disrespecting his uncle. She said she did not know what he was talking about. She took a step back, and Pierre told her not to move like that. D.D. told her she knew what Pierre was talking about and to stop "being stupid." Defendant testified she did not know Pierre was talking about the Snapchat video she and her brother had made. When she stepped back and away from the young men, Pierre said, "[D]on't move I got that bitch on me." She thought this meant Pierre had a weapon. Defendant continued to move backward and away from Pierre and D.D., who both appeared angry.

¶ 99          Pierre and D.D. then started walking toward her. Pierre then said, "[S]o I'm going to ask you one more time, did you diss my uncle." Defendant said she responded yes "just to get it over with." Pierre then said, "[S]o what you trying to do. Let's take it to the street." Defendant said this meant Pierre wanted to beat her up away from the school. Defendant believed Pierre and D.D. wanted to inflict great bodily harm on her. Defendant continued to walk backward and then went forward between Pierre and D.D. and walked toward 11th Street while trying to create distance between herself and the two young men—who were also walking toward 11th Street—to avoid getting beaten up. Pierre and D.D. were telling defendant they were going "to fuck [her] up" and "beat [her] ass" and "shit like that." Defendant denied making any threatening statements to Pierre and D.D. She did not think she could successfully fight both young men at the same time.

¶ 100          When defense counsel asked what happened when she got to the 11th Street

sidewalk, she responded:

> "They just—they was walking this way and they turned towards me and they started—they started walking towards me. And I went to move out the way so I was in the grass part by the bus. And they got behind me. And I didn't want—I didn't want to feel like I couldn't turned [*sic*] around because I got scared.
>
> And then I heard [D.D.] say; we might as well just do it right now. And somebody, I don't know who said it, but somebody said; let's get her. Let's get her."

She testified she turned at that point to defend herself because she thought Pierre and D.D. were going to "[p]unch and jump and all that, like stomp me out and stuff like that." She said she did not have any ill will toward D.D. or Pierre and was carrying a knife because she lived in and had to walk through dangerous neighborhoods.

¶ 101    On cross-examination, defendant said she was looking for opportunities to escape because Pierre said he had a weapon. The State pointed out defendant did not run from the young men, yell for help, get on one of the school buses, or go back toward the building where the adults were and wait for her sister. Defendant said she did not think she could outrun Pierre and D.D. and thought running would have made the situation worse. She also said she was having trouble thinking and did not see her sister.

¶ 102    When the State asked about her knife, defendant said it was a folding knife, which she had open in her pocket before she stabbed Pierre. Defendant testified she kept the knife in her possession at school and had it open when she was not in the school building. On the day in question, defendant testified she opened the knife outside the school while standing by the benches waiting for her sister. When asked what she thought Pierre and D.D. were going to do to her,

defendant said she was afraid they were going to punch and kick her and maybe use a weapon on her. As for J.W., defendant said she was not paying much attention to him.

¶ 103　　　　Defendant admitted pulling her open knife out of her coat pocket and stabbing Pierre in the chest one time while his hands were down. She did not know if Pierre hit her back. After stabbing Pierre, she then stabbed D.D. when he ran and swung at her. She did not remember making a big circle outside the gym and walking north after she stabbed D.D. However, she remembered seeing Doss and telling him to call whoever he wanted after someone mentioned calling the police. She denied saying she hoped someone died. Defendant claimed she put the knife in her pocket but lost it while running from the school.

¶ 104　　　　Defense counsel did not ask defendant any questions on redirect examination.

¶ 105　　　　In closing, defense counsel argued defendant acted in self-defense. In the alternative, if the trial court found defendant did not act in self-defense, defendant argued she should only be found guilty of second degree murder because she believed her actions were justified. Further, defendant argued the undisputed evidence showed Pierre and D.D. were planning to confront defendant after school, and defendant did nothing wrong by waiting for her sister. Pierre, D.D., and J.W. approached and confronted defendant, not the other way around.

¶ 106　　　　Defense counsel pointed out the State's failure to call J.W., who was present for everything outside the school, to testify about what was being said between Pierre, D.D., and defendant. Defendant asked the trial court to infer J.W. did not testify because Pierre, D.D., and J.W. planned to harm defendant. Defendant noted the evidence established Pierre and D.D. were angry when they approached defendant. Pierre had gone ballistic earlier in the day and indicated he planned to do something he knew was wrong, was still angry at the end of the day, and was making comments he was going to fight a female at the end of the school day. Further, Redpath

conceded the State had no evidence defendant had a motive to hurt either Pierre or D.D. Defense counsel argued that even after defendant had achieved some separation from Pierre and D.D. and was north of the two young men, they were still saying things to her and then turned and walked north toward her. After defendant passed the young men in the grass, they then turned and started walking south right behind her and making comments she believed meant an attack was imminent. Only at that point did she resort to self-defense.

¶ 107    Defense counsel argued this was not going to be a fair fight. The fact D.D. rushed at defendant when he did not know she had stabbed defendant establishes the young men were all going to attack defendant. Counsel maintained even a fourth unidentified man rushed at defendant before realizing she had a knife. Defense counsel argued defendant's belief she was going to get jumped and hurt badly by multiple young men was both objectively and subjectively reasonable. Counsel noted the State's refusal to admit defendant had been retreating and trying to avoid a fight with the young men from the moment they first approached her. Further, counsel argued the State failed to rebut defendant's testimony she carried a knife because of the dangerous neighborhood she had to walk through on her way home. Finally, counsel argued defendant's use of the knife was justified because she was about to get beaten up by four young men.

¶ 108    The State responded it did not need to rebut what it categorized as defendant's incredible and self-serving testimony. Further, the trial court did not need to consider whether defendant acted in self-defense because she only claimed she used "deadly force in the face of a beat down." The State argued that reason was insufficient as a matter of law to establish defendant acted in self-defense. Further, the State told the court it had heard no credible evidence Pierre intended to fight defendant. In the alternative, even if Pierre intended to fight defendant, defendant's act of stabbing Pierre in the heart was not justified. According to the State, defendant

was the initial aggressor because she was the first person to strike a blow, she could have run away from the young men, she did not subjectively believe her life was in danger, and, even assuming, *arguendo*, D.D. was the initial aggressor, D.D. had abandoned his course of conduct when he walked away after flinching at defendant.

¶ 109　　　After the trial court stated it had carefully considered all the evidence in the case, including the exhibits, testimony, the credibility of the witnesses based on its observations of their demeanor, and considering all applicable Illinois law, it found defendant guilty on all counts. The court did not provide any factual findings, legal reasoning, or other explanation for its decision.

¶ 110　　　On March 7, 2023, defendant filed a motion for a new trial. On April 19, 2023, the trial court denied defendant's posttrial motion and sentenced her to the following consecutive sentences: 30 years for first degree murder, to be served at 100% ; 10 years for attempt (first degree murder), to be served at 85%; and 3 years for unlawful use of a weapon. On June 15, 2023, the trial court denied defendant's motion to reconsider her sentence.

¶ 111　　　This appeal followed.

¶ 112　　　　　　　　　　　　　II. ANALYSIS

¶ 113　　　　　　　　　A. Defendant's Transfer to the Criminal Court

¶ 114　　　Defendant asks this court to reverse her conviction and vacate the juvenile court's transfer order. According to defendant, the juvenile court abused its discretion when it granted the State's petition, which was filed pursuant to section 5-805(3) of the Act (705 ILCS 405/5-805(3) (West 2020)), because the State failed to present sufficient evidence on all the statutory and nonstatutory factors the juvenile court was required to consider before allowing the discretionary transfer.

¶ 115　　　Section 5-805(3)(a) of the Act states:

"(a) If a petition alleges commission by a minor 13 years of age or over of an act that constitutes a crime under the laws of this State and, on motion of the State's Attorney to permit prosecution of the minor under the criminal laws, a Juvenile Judge assigned by the Chief Judge of the Circuit to hear and determine those motions, after hearing but before commencement of the trial, finds that there is probable cause to believe that the allegations in the motion are true and that it is not in the best interests of the public to proceed under this Act, the court may enter an order permitting prosecution under the criminal laws." *Id.* § 5-805(3)(a).

However, in making that determination, section 5-805(b) lists certain factors the juvenile court "shall consider among other matters," including the following: (1) the age of the minor; (2) the minor's history (including the minor's previous delinquent or criminal history; the minor's history of previous abuse or neglect; and "any mental health, physical, or educational history of the minor or combination of these factors"); (3) the circumstances of the offense (including "the seriousness of the offense"; "whether the minor is charged through accountability"; whether evidence exists the offense was (a) "committed in an aggressive and premeditated manner" and/or (b) "caused serious bodily harm"; and "whether there is evidence the minor possessed a deadly weapon"); (4) "the advantages of treatment within the juvenile justice system including whether there are facilities or programs, or both, particularly available in the juvenile system"; and (5) whether the security of the public requires the minor to be sentenced as an adult considering "the minor's history of services, including the minor's willingness to participate meaningfully in available services"; "whether there is a reasonable likelihood that the minor can be rehabilitated before the expiration of the juvenile court's jurisdiction"; and "the adequacy of the punishment or services." 705 ILCS 405/5-805(3)(b) (West 2020).

¶ 116    The statute also makes clear the juvenile court is to give "greater weight to the seriousness of the alleged offense [and] the minor's prior record of delinquency," as opposed to the other factors. *Id.* § 5-805(3)(b). In addition to the statutory factors, "[o]ur supreme court has stated that the minimum sentence or term of years defendant would have to serve under the Criminal Code [of 2012 (Criminal Code)] should be considered as a factor in addressing and weighing the competing interests." *People v. Moore*, 2011 IL App (3d) 090993, ¶ 27 (citing *People v. Clark*, 119 Ill. 2d 1, 14 (1987)).

¶ 117    "The decision to permit prosecution of a juvenile under the criminal law is a matter of judicial discretion." *Id.* ¶ 21. However, the juvenile court's "discretion is limited and controlled by the Act." *Id.* "In *Clark*, the [supreme] court observed that the juvenile court's discretion to waive jurisdiction must be exercised within the limits of due process and must comport with the applicable statutory guidelines." *Id.* ¶ 27 (citing *Clark*, 119 Ill. 2d at 12). Before an appellate court affirms an order transferring a minor to criminal court, the appellate court must determine if the record contains sufficient evidence on each of the factors the juvenile court is required to consider before allowing a minor to be prosecuted under the criminal law. *Id.* ¶ 21. "The mere recitation in the record that all statutory factors have been considered is not enough to affirm a discretionary transfer order." *Id.*

¶ 118    "The purpose of a transfer proceeding is to balance the best interests of the juvenile offender, particularly as his interests relate to his potential for rehabilitation, against the public's interest in being protected from crime." *Id.* ¶ 19 (citing *People v. Morgan*, 197 Ill. 2d 404 (2001); *Clark*, 119 Ill. 2d 1). Further, when weighing the relevant statutory and nonstatutory factors, the juvenile judge considering a transfer petition must balance the needs of society and the minor. *Id.* According to our supreme court, the transfer statute is "rooted in the constitutional requirement of

procedural due process." *Clark*, 119 Ill. 2d at 8. The standard for determining compliance with due process is whether the transfer proceeding was fundamentally fair. *People v. Taylor*, 76 Ill. 2d 289, 302 (1979).

¶ 119       In *Clark*, the supreme court indicated neither the State, defense counsel, nor the juvenile judge indicated any awareness the defendant would be given a natural life sentence if convicted of the two murders with which he had been charged. *Clark*, 119 Ill. 2d at 15. Further, the court held the record made it abundantly clear the juvenile court judge did not consider whether a natural life sentence was in the defendant's best interests or was required by society. *Id.* at 16. As a result, the court concluded the transfer hearing was inadequate because the juvenile court judge failed to weigh defendant's potential eligibility for a mandatory natural life sentence if he was tried and convicted in criminal court of the two murders for which he was charged. *Id.*

¶ 120       In addition, the supreme court also held the *Clark* minor's transfer hearing was inadequate for two other reasons. According to the court, the record showed a failure to investigate the defendant's history, especially as it related to his potential for rehabilitation, and a failure to investigate the availability of rehabilitative services available to the minor if he was not transferred out of the juvenile court. *Id.* Specifically, the record showed the juvenile court judge basically gave no consideration to the defendant's history, the existence of treatment or rehabilitation facilities, or the defendant's amenability to rehabilitation or treatment. *Id.* at 18.

¶ 121       With regard to the defendant's history of delinquency, the juvenile court judge in *Clark* was only provided information about three minor encounters the defendant had with juvenile authorities. Only one of those instances was supported by facts the defendant engaged in criminal conduct. *Id.* at 19. That incident involved an attempt to shoplift toy cars when the defendant was 10 years old. *Id.* The second alleged incident was a theft under $150, for which the State provided

no details to the court. *Id.* The third alleged incident was for disorderly conduct, but the State's witnesses established the defendant was merely present and not involved. *Id.*

¶ 122    As for the availability of rehabilitation and treatment services for the defendant, the supreme court in *Clark* noted the juvenile court only heard the opinion of a juvenile probation officer, who testified he was unaware of any facilities where the minor could receive treatment without providing any basis for this assertion. Further, in *Clark*, the juvenile court indicated this same probation officer also testified he thought it was in the best interests of the minor and society that he be prosecuted under the criminal laws, giving as his only reason " 'the allegations against the minor.' " *Id.* The supreme court noted the juvenile court judge did not ask the probation officer any questions about either of his assertions.

¶ 123    In *Clark*, our supreme court then offered the following explanation and guidance:

"Viewing the record of the transfer hearing in the instant case in its entirety in light of the language and purpose of the transfer provision and in light of *People v. M.D.* and *People v. Taylor*, *supra*, we conclude that defendant's transfer hearing was inadequate. In reaching this conclusion, we do not minimize the seriousness of the offenses for which defendant was charged and, after two trials, ultimately convicted. However, we are unable to ignore the fact that this defendant had no history of violent criminal conduct and, in fact, apparently had virtually no criminal history whatsoever. Moreover, we cannot ignore the fact that the legislature has given certain protections to minors of the age of the defendant who are alleged to have committed serious offenses. It is our constitutional responsibility to insure that these protections are afforded by enforcing the language and spirit of the transfer provision." *Id.* at 20-21.

Our supreme court then vacated the juvenile court's order transferring the defendant for trial as an adult and remanded the case for a new trial, starting with a new transfer hearing.

¶ 124     In the instant case, defendant argues the record did not contain sufficient evidence as to several of the statutory and nonstatutory factors the juvenile court was required to consider before transferring defendant for prosecution under the criminal law. According to defendant's brief, the juvenile court (1) failed to properly consider the importance of defendant's age and intellectual ability; (2) did not have sufficient information regarding defendant's history of delinquency; (3) did not have sufficient information with regard to the types of facilities and services available in DOJJ or the Illinois Department of Corrections; (4) did not have sufficient information about defendant's history of services or her willingness to participate in services; and (5) did not know defendant faced a 27-year minimum sentence if she was convicted in criminal court.

¶ 125     We need not address defendant's arguments with regard to each of these factors because it is clear the juvenile court did not have sufficient information before it to adequately consider defendant's history of delinquency. As noted earlier, section 5-805(3)(b) of the Act states the juvenile court "shall give greater weight to the seriousness of the alleged offense [and] the minor's prior record of delinquency than to the other factors listed in this subsection." 705 ILCS 405/5-805(2)(b) (West 2020).

¶ 126     Here, Nancy Melcher testified defendant had two prior referrals with Sangamon County court services involving allegations of aggravated battery and battery. She indicated both allegations resulted in defendant receiving an informal station adjustment, not an adjudication. Melcher also testified defendant had not received any office referrals while in high school but had 52 office referrals while in middle school, stating 77% of the referrals were for disrespect and 11%

were for aggression and bullying. In addition, Melcher testified defendant had been in two fights while being housed at the Peoria County Juvenile Detention Center.

¶ 127 However, neither Melcher nor anyone else provided any specific factual information regarding the circumstances for the referrals that led to the informal station adjustments, the middle school office referrals, or the two "fights" at the juvenile detention center. Considering the importance the legislature intended a juvenile court to place on a minor's prior record of delinquency, the State's reliance on broad, generic information about alleged bad acts was not sufficient for the juvenile court to adequately consider this factor in determining whether the State should be able to prosecute defendant under the criminal law.

¶ 128 The State suggests, "although little evidence existed of a significant bad history from defendant, the court's assessment appears to accurately reflect that fact." According to the State, "The court did not unduly focus on this portion of defendant's history in coming to its conclusion[ ]" to transfer defendant. We disagree. Because the juvenile court was given no factual information about any of these prior incidents, the juvenile court was left to assume what occurred and then made unsupported assumptions regarding what defendant should have learned from those incidents and what services were made available through the school district and court services.

¶ 129 When explaining its ruling to transfer defendant, the juvenile court correctly stated the law required it "to give the greatest weight to the seriousness of the alleged offense and the minor's history of delinquency." The juvenile court then made the following statement regarding defendant's history of delinquency:

"[T]his Court does look at non-adjudicated offenses at a different level than adjudicated offenses and history. I can't completely ignore the factors involved and all the factors involved in regards to the non-court intervention in relationship to

the battery and the aggravated battery. At the very least, those should have been a wake-up call where she should have taken advantage of the services that were offered through the school district and I imagine through court services, as well. And that didn't happen. That is a previous history. And it fits in not only in regards to delinquent behavior but it fits with the findings in regards to the defiance and lack of empathy and unwillingness to engage in services, as do the more recent activity while she was in the detention center on this charge itself."

Contrary to the State's assertion, based on the court's statements, it appears the court gave defendant's juvenile referrals, station adjustments, and the two fights in which defendant was involved in the juvenile detention facility considerable weight, which the statute clearly instructs it to do. However, because the juvenile court was not provided any specific factual information regarding the juvenile referrals, the station adjustments, or the two fights at the juvenile detention center, the court did not have sufficient information to properly consider defendant's history of delinquency.

¶ 130     Before the juvenile court could properly consider defendant's history of delinquency, it needed to know specifically what defendant had done and the context in which she had done it. The State simply presented very vague information and invited the juvenile court to assume defendant had a propensity for violence. Because the juvenile court did not have adequate evidence to consider defendant's history of delinquency based on the facts in this case, we conclude the trial court abused its discretion in allowing defendant to be prosecuted under the criminal law. In arriving at our decision, we understand defendant was charged, and after a bench trial, convicted of serious offenses. However, as our supreme court explained in *Clark*,

"we cannot ignore the fact that the legislature has given certain protections to

minors of the age of the defendant who are alleged to have committed serious offenses. It is our constitutional responsibility to insure that these protections are afforded by enforcing the language and spirit of the transfer provision." *Clark*, 119 Ill. 2d at 21.

Accordingly, we reverse the judgment of the Sangamon County circuit court, vacate the juvenile court's transfer order and remand this case to the juvenile court for further proceedings.

¶ 131                    B. Other Issues Regarding the Transfer Hearing

¶ 132         Although we need not consider any of defendant's other arguments regarding the transfer hearing, the record also establishes the juvenile court did not have sufficient information to properly consider the "advantages of treatment within the juvenile justice system." Further, the record establishes a strong probability the trial court misunderstood the minimum sentence defendant faced in criminal court if convicted of all the offenses for which she was charged.

¶ 133                    1. *Advantages of Treatment in DOJJ*

¶ 134         Defendant cited *Moore* for the proposition "[a] juvenile judge must evaluate information concerning the type of facilities available for the treatment or rehabilitation of the minor and must evaluate the likely effectiveness of those facilities in light of the history and present circumstances of the minor." *Moore*, 2011 IL App (3d) 090993, ¶ 20 (citing *Morgan*, 197 Ill. 2d at 428-29). In this case, the juvenile court correctly noted there was limited evidence regarding the advantages of treatment for defendant within DOJJ.

¶ 135         From our review of the record, sufficient evidence was not presented regarding the advantages of treatment *of the minor* within DOJJ. Instead, Melcher only testified DOJJ had a facility for females in Warrenville and the facility provided school, substance abuse, mental health, and medical services. However, the State offered no evidence regarding what those services

entailed, whether the services were mandatory, how they would or would not benefit defendant, or how those services differed from services provided in the Illinois Department of Corrections. Further, the juvenile court was not provided any information regarding whether defendant could receive the treatment in DOJJ Eckert opined defendant needed.

¶ 136                                     2. *Possible Minimum Sentence*

¶ 137        In addition, the record establishes a strong probability the juvenile court did not know the correct minimum sentence defendant faced if convicted of the charged offenses in criminal court. On appeal, the parties do not dispute that defendant faced a mandatory minimum sentence of 27 years if she was transferred to the criminal court and convicted of first degree murder, attempt (first degree murder), and unlawful use of a weapon. "Our supreme court has stated that the minimum sentence or term of years defendant would have to serve under the Criminal Code should be considered as a factor in addressing and weighing the competing interests" of the juvenile offender and the public's interest in being protected from crime. *Id.* ¶ 27 (citing *Clark*, 119 Ill. 2d at 14).

¶ 138        In response, the State asserted a court is presumed to know the law regarding a potential sentence. *Morgan*, 197 Ill. 2d at 431. Further, the State argued its motion to transfer defendant to criminal court indicated defendant could be sentenced to 20 to 60 years for first degree murder, 6 to 30 years for attempt (first degree murder), and 1 to 3 years for unlawful use of a weapon, with a conviction for first degree murder being mandatorily consecutive to the other counts.

¶ 139        However, despite the language in the motion to transfer, the State argued at the transfer hearing that defendant could only be kept in custody until she was 21 years old if she was kept in juvenile court but could be sentenced to between 20 to 60 years, served at 100%, if

transferred to criminal court. Further, when explaining its decision to transfer defendant to criminal court, the juvenile court did not make any indication it understood defendant would face a minimum 27-year sentence if she was convicted of first degree murder, attempt (first degree murder), and unlawful use of a weapon. Instead, the court stated it was cognizant defendant could be sentenced to 20 to 60 years in prison if she was convicted of first degree murder. As a result, we will not presume based on the facts before us that the juvenile court understood defendant could face a mandatory minimum sentence of 27 years in criminal court.

¶ 140                    C. Defenses and Lesser Offenses

¶ 141                            1. *Self-Defense*

¶ 142          Even though we have determined the juvenile court abused its discretion in transferring defendant to criminal court, we must still address defendant's argument this court should reverse her first degree murder and attempt (first degree murder) convictions because the State failed to negate beyond a reasonable doubt any element of her self-defense claim. Assuming, *arguendo*, this court might determine the State did negate defendant's self-defense claim, she argued her first degree murder conviction should be reduced to either (1) second degree murder because she established by a preponderance of the evidence her mistaken belief she was acting in self-defense or (2) involuntary manslaughter because she acted recklessly.

¶ 143          Defendant's arguments constitute a challenge to the sufficiency of the evidence in this case. As a result, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when the evidence is viewed in a light most favorable to the prosecution. *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). Unfortunately, the trial judge at defendant's bench trial offered no factual findings, credibility determinations, or legal reasoning to explain his judgment in this case.

¶ 144　　　　In a case like this, when a defendant is charged with murder but asserts she acted in self-defense, "the State must prove *more* than the three elements of first degree murder." (Emphasis in original.) *People v. Jeffries*, 164 Ill. 2d 104, 128 (1995). According to our supreme court, "The State must also prove that the murder was not carried out in self-defense, and that the defendant's use of force was not legally justified." *Id.*

> "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

"If the State negates any one of these elements, the defendant's claim of self-defense must fail." *Id.*

¶ 145　　　　While other trial judges and juries might have determined defendant acted in self-defense, we cannot say no reasonable trier of fact could have determined defendant did not act in self-defense based on the evidence before the trial court. While it seems arguable that Pierre and D.D. were both initially acting aggressively toward defendant and it is possible defendant did nothing aggressive before she stabbed Pierre, a reasonable trier of fact could have determined the surveillance videos established beyond a reasonable doubt that defendant was not in imminent danger of harm and that defendant's use of force (stabbing Pierre and then D.D.) was not necessary based on the situation. This incident took place outside a school with multiple students and adults present. A trier of fact could reasonably determine Pierre, D.D., and J.W. posed no imminent physical threat to defendant before she stabbed Pierre. Further, even if a trier of fact concluded

defendant faced an imminent danger, a reasonable trier of fact could have also determined stabbing Pierre and then D.D. was not justified because Pierre, D.D., and J.W. were unarmed, and defendant could have screamed for help, ran from the young men to get help, or even jumped on one of the school buses right by where she stabbed Pierre and D.D. In other words, this was not a situation where defendant was alone and without any means of escaping a potential attacker or attackers.

¶ 146                                   2. *Mistaken Belief Self-Defense*

¶ 147          We next turn to defendant's argument that this court should reduce her first degree murder conviction to second degree murder. At a minimum, relying on *People v. Hawkins*, 296 Ill. App. 3d 830, 836-38 (1998), defendant argues she proved by a preponderance of the evidence that she believed that the circumstances justified her use of force to defend herself, even if her belief was mistaken. Unlike the trial court, this court was not able to observe defendant when she testified. As a result, the trial court was in a better position to judge defendant's credibility. Although the trial court made no findings regarding the credibility of any witnesses, we can reasonably infer the trial court did not find defendant's testimony credible. Based on the record, we are not in a position to hold no reasonable trier of fact could have reached this same decision.

¶ 148                                   3. *Involuntary Manslaughter*

¶ 149          Finally, defendant argues her first degree murder conviction should be reduced to involuntary manslaughter. Section 9-3(a) of the Criminal Code (720 ILCS 5/9-3(a) (West 2020)) states, "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." Based on the facts in this case, we see no merit in defendant's argument on this issue. The evidence established defendant intentionally, not recklessly, stabbed Pierre in the heart with a knife. We

address this argument no further.

¶ 150                           D. Relief for Defendant

¶ 151          Although we have determined an outright reversal of the trial court's judgment in this case based on the sufficiency of the evidence presented at defendant's criminal trial would not be appropriate, the trial court's judgment still must be reversed and the case remanded to the juvenile court for further proceedings because the juvenile court abused its discretion by transferring defendant from the juvenile court to the criminal court without having sufficient information on all the factors the juvenile court was required to consider before making the transfer decision.

¶ 152                           E. Other Issues Raised by Defendant

¶ 153          Because we have reversed the circuit court's judgment in this case and are remanding this case for further proceedings in the juvenile court, we need not address defendant's arguments regarding the expert testimony of Dr. Eckert or the sentence imposed by the circuit court.

¶ 154          F. Inaccurate Information Provided to the Juvenile Court at the Transfer Hearing

¶ 155          Although we have already held the trial court's judgment must be reversed, the juvenile court's order transferring defendant from juvenile court to criminal court must be vacated, and the case must be remanded for further proceedings in the juvenile court, this court would be remiss and would do a disservice to the juvenile court on remand if we did not comment on inaccurate testimony provided to the juvenile court by Detective Redpath, the State's conduct in eliciting this inaccurate testimony, the State's arguments based on Redpath's inaccurate testimony, defense counsel's failure to impeach Redpath's inaccurate testimony, and the juvenile court's acceptance and reliance on this inaccurate testimony and argument when transferring defendant to

criminal court.

¶ 156    While it seems defendant's appellate counsel recognized Redpath provided the juvenile court with inaccurate information at the juvenile transfer hearing that was inconsistent with his trial testimony, defendant's appellate counsel did not argue defendant's trial counsel was ineffective for failing to effectively challenge Redpath's testimony. Further, appellate counsel did not argue the juvenile court's transfer decision should be reversed because the juvenile court's findings and reasoning showed it failed to understand the circumstances of the charged offenses in this case.

¶ 157    Because these issues were not raised on appeal, the State did not address these issues. As a result, while this court can discuss the discrepancies and inaccuracies, we are not in a position to determine why those events occurred.

¶ 158    We will briefly discuss two of the noted discrepancies. First, at the juvenile transfer hearing, Redpath testified he had reviewed the surveillance video acquired by the police during the investigation. Yet, at the juvenile transfer hearing, Redpath provided inaccurate testimony regarding the surveillance videos. For example, Redpath testified B.P.'s statement that two young men were with Pierre when he approached defendant was not correct. According to Redpath, when he reviewed the surveillance video, he did not see two people with Pierre, only one. Defendant's attorney at the transfer hearing failed to challenge Redpath's testimony. We note the surveillance videos clearly showed two people, D.D. and J.W., were both in close proximity to Pierre from the moment he left the school building until he was stabbed by defendant. Then, despite his prior testimony at the transfer hearing, during his testimony at defendant's criminal trial Redpath admitted the surveillance video established there were two people in addition to Pierre just as B.P. had indicated and was shown in the surveillance video.

¶ 159    During its rebuttal argument at the transfer hearing, the State relied on Detective Redpath's testimony there was only one other person with Pierre to discredit B.P.'s voluntary statement to the police and challenge the claim defendant was followed when it argued:

> "I know that [defense counsel] would like this Court to put a lot of stock into the interview of [B.P.] who very clearly and very confidently stated that there were three people that were coming at [defendant] after that school let out; however, that is directly contrary to the surveillance video that this Court has seen.
>
> There are a lot of issues with [B.P.'s] statements and I think that that is something that the Court should consider that once again while all signs point to, yes, Pierre and [defendant] had an issue and they were going to address it in some way. That surveillance video shows exactly how they were going to address it and it was—there was a conversation that occurred in the very beginning of that video and everybody starts walking away."

¶ 160    Our review of the record provides no explanation of the change between Detective Redpath's transfer hearing testimony and his testimony at the criminal trial regarding the surveillance video.

¶ 161    Second, we note the State and Redpath's representation of what the school bus's surveillance video showed varied between the juvenile court's transfer hearing and the criminal trial. Redpath's trial testimony about this evidence contradicted his testimony at the juvenile transfer hearing. At defendant's criminal trial, Redpath testified Pierre, D.D., and J.W. were visible on the bus surveillance video moving north toward defendant's location before defendant can be seen moving south. However, at the juvenile transfer hearing, when the State questioned Redpath about the bus video, he testified the time frame of his investigative concern was only the 22 seconds

from the 1:26 mark of the video after defendant walked into view until after she had stabbed both Pierre and D.D. To the State's credit in this instance, it played the bus surveillance video from the 1:20 mark—instead of the 1:26 mark Redpath identified—and asked Redpath to indicate when he saw defendant, Pierre, or D.D. in the video. Although Pierre and D.D. can clearly be seen walking north toward defendant's location, Redpath failed to identify either of these young men. Instead, Redpath testified defendant was the first of the three to be seen on the bus video. According to Redpath's testimony at the transfer hearing, defendant walked into the video in front of (south of) Pierre and D.D. Neither the State nor defense counsel corrected Redpath's inaccurate testimony about the surveillance video at the transfer hearing.

¶ 162 We have noted two of these discrepancies in the effort to aid the juvenile court because the case is being remanded on other grounds. We are not suggesting these are the only discrepancies in Redpath's testimony that occurred. On remand, if the juvenile court conducts another transfer hearing, we urge the juvenile court to carefully consider the evidence presented, especially the surveillance video.

¶ 163                                 III. CONCLUSION

¶ 164 For the reasons stated, the judgment of the circuit court of Sangamon County is reversed, the juvenile court's order transferring defendant for trial as an adult under the Criminal Code is vacated, and the cause is remanded to juvenile court for further proceedings. Further, we find that the interests of the parties and the administration of justice would be most efficiently served by assigning the case to a different judge on remand. On remand, we direct a judge other than Judge Gab to preside over the juvenile proceedings and, if the case is ultimately transferred back to the criminal court, the criminal proceedings.

¶ 165 Reversed and vacated; cause remanded with directions.